**MAY'S FAMILY CENTERS,
INC., Plaintiff,**

**v.**

**GOODMAN'S, INC., Defendant.**

**No. 82 A 1786.**

United States District Court,
N.D. Illinois, E.D.

Sept. 19, 1983.

Bernard Wiczer, Daniel O. Hands, Wiczer & Associates, Ltd., Chicago, Ill., for plaintiff.

James C. Murray, Jr., Kenneth L. Block, Chicago, Ill., Synde Beth Keywell, Detroit, Mich., Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER[*]

SHADUR, District Judge.

May's Family Centers, Inc. ("May's") has sued Goodman's, Inc. ("Goodman's") for (1) breach of contract and (2) tortious interfer-

ence with a business relationship between May's and Zayre Corp. ("Zayre").[1] Goodman's moves under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss May's six-count Amended Complaint (the "Complaint")[2] for failure to state a claim upon which relief can be granted. For the reasons stated in this memorandum opinion and order, each component of Goodman's motion is denied.

### Facts[3]

Central National Bank of Chicago ("CNB"), legal titleholder to the Premises,[4] leased them to Goodman's in December 1964. Then in November 1971 Goodman's and CNB, as lessors, leased the premises to Kankakee Bell Discount Department Store, Inc. ("Kankakee"), which later assigned that lease as amended (the "Main Lease") to Belscot Department Stores of Illinois, Inc. ("Belscot of Illinois").[5]

On June 22, 1978 Belscot of Illinois in turn demised the Premises to May's (under

---

[*] As the caption reflects, the convenient shorthand reference to each party is a possessive noun. That makes it awkward to engage in proper usage where that noun is itself employed in the possessive form (as in "May's' Complaint" or "Goodman's' motion"). With apologies to grammatical purists, for ease of expression this opinion will cheat a bit by simply referring, for example, to "May's Complaint" and "Goodman's motion."

1. Originally the May's claim was asserted in its own bankruptcy proceedings as a counterclaim to two claims by Goodman's: one for possession of business property at 831 West 119th Street, Chicago, Illinois (the "Premises"), and the other for the rental value of the Premises. In accordance with paragraph C(2) of this District Court's December 20, 1982 General Order, the May's counterclaim was transferred from the Bankruptcy Court to this Court.

2. Counts V and VI were amended August 23, 1983 by leave of this Court.

3. As every Rule 12(b)(6) motion requires, this Court accepts as true all well-pleaded allegations in the Complaint, drawing all reasonable inferences in favor of May's. *Mathers Fund, Inc. v. Colwell Co.,* 564 F.2d 780, 783 (7th Cir.1977).

4. CNB is trustee under an Illinois land trust. In most states the "land trust" would be viewed as a naked or dry trust, executed by the Statute of Uses and therefore defeating the

entire business purpose of the device. Though the standard form of land trust agreement (an unrecorded document) gives the trust beneficiary full power of direction over the trustee, which is contractually barred from acting absent such direction, in legal concept the trustee holds *both* legal and equitable title to the real estate, with the beneficiary having only the right to the property's earnings, avails and proceeds. What Illinois views as sufficient to convert a passive to an active trust is the trustee's residual duty to reconvey the property to the beneficiary at the end of a period (normally 20 years, to avoid the Rule against Perpetuities) if the property is still held in trust. In the meantime the outside world is free to deal with the trustee in all matters relating to the property, because the recorded deed conveying the property to the trustee is a "full power deed in trust," authorizing the trustee to act without reference to any limitations imposed by the trust agreement.

5. Both Kankakee and Belscot of Illinois are apparently corporate subsidiaries of Belscot Retailers, Inc., which was guarantor of the Main Lease under a separate guaranty. From Exhibit II to the August 23, 1982 Amendment to the Complaint it appears Belscot of Illinois may have assigned the Main Lease to its parent, which in turn joined with May's in the proposed Zayre transaction (though the Complaint's text does not speak of that possible further assignment). This opinion will use "Belscot" to designate the assignee of the Main Lease at the time of the Zayre deal (whether Belscot of Illinois or the parent corporation).

the "Sublease") with Goodman's consent. Sublease ¶ 10 provides:

INCORPORATION BY REFERENCE: The provisions of the Main Lease are incorporated herein and made part of this Sublease with the same force and effect as if set forth at length herein, and this Sublease is subject and subordinate to all of the terms, provisions, covenants, undertakings, agreements, obligations and conditions contained herein.

However, because Goodman's consent had been given in advance by a June 15 letter,[6] there is nothing in the record to show Goodman's had any knowledge of Paragraph 10.

On January 21, 1981 May's (with Belscot's agreement) entered into an agreement with Zayre (the "Agreement") to assign the Main Lease to Zayre for $500,000. Almost exactly a year later May's asked Goodman's to consent to the assignment pursuant to Main Lease § 6.01 ("Section 6.01"):

Lessee will not assign this Lease in whole or in part, nor sublet all or any part of the leased premises, without the prior written consent of Lessor in each instance, which consent shall not be unreasonably withheld. It shall not be deemed to be unreasonable for Lessor to refuse consent to a proposed assignee which does not have a net worth equal to Belscot's net worth as of the date of the assignment and which does not have a history of operating retail discount or department stores in a manner similar to that of Lessee. The consent by Lessor to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. This prohibition against assigning or subletting shall be construed to include a prohibition against any assignment or subletting by operation of law. If this Lease be assigned, or if the leased premises or any part thereof be underlet

or occupied by anybody other than Lessee, or its permitted licensees and concessionaires, Lessor may collect rent from the assignee, undertenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, underletting, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, under-tenant or occupant as tenant, or a release of Lessee or any Guarantor from the further performance by Lessee or any Guarantor of covenants on the part of Lessee herein contained. Notwithstanding any assignment or sublease, Lessee or any Guarantor shall remain fully liable on this Lease and shall not be released from performing any of the terms, covenants and conditions of this lease unless Lessor has consented to said sublease as herein provided. Nothing contained herein shall prevent Lessee from granting sublicenses or concessions for the conduct of any department within Lessee's store as long as said department is operated as part of Lessee's store and its gross sales are reported as part of Lessee's herein.

Goodman's refused such consent even after May's told Goodman's (1) the Agreement would expire February 6, 1982[7] and (2) May's needed the $500,000 to carry on its retail business.

After the Agreement had already expired, Goodman's did belatedly consent to May's proposed assignment to Zayre. May's then asked Zayre to renew its offer. Zayre agreed to do so if May's would deliver Goodman's consent before April 2, 1982. Some time before April 2 Goodman's communicated directly with Zayre and led it to believe Goodman's would not consent. Zayre then refused to negotiate further with May's.

---

**6.** Belscot's request for consent had confirmed "Belscot Retailers, Inc. remains the guarantor and will continue to pay the rent directly to [Goodman's] and be responsible for all other conditions of the lease." Hence Goodman's apparently had no concern about the terms of the later-executed sublease to May's.

**7.** Because the current motion addresses only the pleadings, there is no occasion to explore (1) why May's delayed from January 1981 to January 1982 in seeking Goodman's consent and (2) whether that delay affected the reasonableness of Goodman's refusal.

Each of the six counts in the Complaint is premised on that series of events but alleges a different theory or different damages:

1. Count I alleges breach of the Main Lease, causing the loss of Zayre's $500,000.

2. Count II asserts $10 million in consequential damages resulted from that breach (because May's lost its entire retail business for want of the $500,000).

3. Count III is like Count I, except that May's advances the claim as Belscot's agent as well as on its own behalf.

4. Count IV asserts the same agent-and-principal theory as Count III and the same $10 million consequential damages as Count II.

5. Count V charges Goodman's interfered with May's business relationship with Zayre, causing $500,000 in damages.

6. Count VI makes the same substantive claim but asserts $20 million in damages because of May's loss of its retail business.

### Complaint Counts I–IV: Theory of Liability

Counts I through IV all turn on the same issue: Can May's sue to enforce Section 6.01? Goodman's says May's, as a non-party to the Main Lease, cannot do so because:

1. May's is not in privity with Goodman's.

2. Nor is May's an intended third-party beneficiary of the Main Lease.

May's responds to both contentions by asserting:

1. Privity exists because Sublease ¶ 10 incorporated all provisions of the Main Lease, and Goodman's consented to the Sublease. Indeed Goodman's admitted such privity exists by asserting a claim directly against May's in the bankruptcy proceeding.

2. May's is within the class of entities intended to benefit from Section 6.01. As a third-party beneficiary it can enforce the Main Lease.

Only one of May's theories need be successful to sustain its claims. Because the second does the job, this Court need not consider the dubious first theory.

Under Illinois law a non-party can sue on a contract only if the parties intended to benefit that non-party. *Carson Pirie Scott & Co. v. Parrett,* 346 Ill. 252, 257, 178 N.E. 498, 501 (1931). Though the contract need not name the third party specifically, it must sufficiently describe or designate the non-party. *Candlewick Lake Utilities Co. v. Quinones,* 82 Ill.App.3d 98, 103, 37 Ill.Dec. 479, 483, 402 N.E.2d 369, 373 (2d Dist.1980). Whether someone may sue as a third-party beneficiary depends on the intent of the parties, determined on a case-by-case basis. *Securities Fund Services, Inc. v. American National Bank and Trust Co. of Chicago,* 542 F.Supp. 323, 329 (N.D. Ill.1982).

Application of those principles to the present case brings May's squarely under the mantle of Section 6.01 as an intended beneficiary of Goodman's promises. By its specific terms Section 6.01 contemplated the possibility of successive assignments or sublettings:

1. It expressly negated any one consent as "a waiver of the necessity for such consent to any subsequent assignment or subletting."

2. Most significantly, Goodman's express contractual undertaking in favor of the proposed assignor ("consent shall not be unreasonably withheld") is also expressly made applicable to *every* proposed assignment ("prior written consent of Lessor [Goodman's] *in each instance* ").

Goodman's direct contemplation of successive assignments, coupled with its direct promise as to *each* such assignment,[8] sharp-

---

**8.** It must be remembered that once an original lease assignment has been made, it is the *assignee* and not the original lessee that would be making the next assignment (and hence would require the lessor's consent). Thus Goodman's promise not unreasonably to withhold consent to that second assignment necessarily runs not to the original lessee but to the first assignee—the classic example of an intended third-party beneficiary, described by status though not by name.

ly distinguishes this case from Goodman's effort to rely on such cases as *Slate Printing Co. v. Metro Envelope Co.,* 532 F.Supp. 431, 433–34 (N.D.Ill.1982) (where this Court held a mere assertion the supplier knew the manufacturer intended to sell the product did not make the buyer an intended third-party beneficiary).

Thus May's has alleged the facts required under Rule 12(b)(6) standards to state a claim as an intended third-party beneficiary of Section 6.01. That sustains the Complaint's first four counts in terms of liability, but it remains necessary to examine the sufficiency of the added damage claims of the even-numbered among those counts.

### Complaint Counts II and IV: Consequential Damages

Counts II and IV seek consequential damages [9] based on Goodman's alleged violation of Section 6.01. That claim is based on May's having told Goodman's the Agreement would expire February 6, 1982 and the Zayre $500,000 "was necessary to enable May's to continue to carry on its retail business" (Count II ¶ 11 and Count IV ¶ 12). Goodman's counters such knowledge of possible consequential damages has to be communicated at the time the contract (in this case the Main Lease) was entered into, not at some later date when the situation arises. Unfortunately neither party has really addressed the conceptual underpinnings that should be examined to decide the question.

■ To recover consequential damages based on lost profits, May's would ordinarily have to prove (1) the fact and amount of the loss with a reasonable degree of certainty, (2) Goodman's wrongful act caused the loss and (3) the profits were reasonably within the contemplation of Goodman's when the contract was entered into. *Student Transit Corp. v. Board of Education of the City of Chicago,* 76 Ill.App.3d 366, 369–

70, 32 Ill.Dec. 122, 124, 395 N.E.2d 69, 71 (1st Dist.1979). Both elements (1) and (2) are adequately asserted by the Complaint (given Rule 8's notice pleading approach). What remains for decision is whether the third component is applicable to a situation like that presented here.

*Hadley v. Baxendale* and its progeny proceed from the premise a party cannot fairly be saddled with the "costs of untoward consequences of a course of dealing" unless there is real "foreseeability of harm." *EVRA Corp. v. Swiss Bank,* 673 F.2d 951, 957, 959 (7th Cir.1982). In economic terms the need for notice *before* formation of the contract is to enable the risk-taker to build the cost of that risk into the price for its goods or services. 11 Williston, *Contracts* § 1357, at 295 (3d ed. 1968); cf. 5 Corbin, *Contracts* § 1008, at 74–75 (1964).

Somehow the general goods-and-services rule does not appear to fit here, at least at the threshold pleading stage. In the very different situation posed by this case, this Court's *Erie* function is not simply to parrot the conventional formulation from Illinois cases on which Goodman's relies. *EVRA* put it well, 673 F.2d at 956:

> As so often in diversity cases, there is an irreducible amount of speculation involved in attempting to predict the reaction of a state's courts to a new issue. The best we can do is to assume that the Illinois courts would look to the policies underlying cases such as *Hadley* and *Siegel* [*v. Western Union Tel. Co.,* 312 Ill. App. 86, 37 N.E.2d 868 (1941)] and, to the extent they found them pertinent, would apply those cases here.

■ As an original matter, the reasons that support the requirement of notice when the contract was formed do not necessarily operate here. After all the Main Lease's "not unreasonably withhold consent" clause does not normally have a price

---

**9.** Originally Goodman's asserted May's was asking punitive damages, not allowable as such under Illinois contract law. During a July 15, 1983 status call this Court asked whether May's was not rather claiming special economic damages under the rule of *Hadley v. Baxen-* dale, 9 Ex. 341, 156 Eng.Rep. 145 (1854). May's has confirmed that as the thrust of its claim (notwithstanding its allegations in Count II ¶ 12 and Count IV ¶ 13 that Goodman's acted "wrongfully, wilfully and maliciously, with the intent to harm May's....").

attached to it.[10] On this Rule 12(b)(6) motion, Goodman's as lessor has advanced nothing to show any unfairness in its having to bear risks that were, after all, identified before it was required to act on the request for consent. And Section 6.01 may perhaps be viewed in the same way as an ongoing offer by Goodman's as lessor—an offer that ripens into a contract whenever the current lessee seeks consent to a new assignment.

As our Court of Appeals said in *EVRA*, 673 F.2d at 957:

> [T]he animating principle of *Hadley v. Baxendale*...is that the costs of the untoward consequence of a course of dealings should be borne by that party who was able to avert the consequence at least cost and failed to do so.

That would seem to point to Goodman's rather than May's at this point in the lawsuit (with May's having the benefit of all favorable inferences).[11] When this Court

becomes better informed in factual terms farther into the litigation, perhaps the result may change. For the present, however, Counts II and IV survive.

*Complaint Counts III and IV: May's as Belscot's Agent*

May's has alleged it acted as Belscot's agent (Count III and Count IV ¶¶ 5–7) in attempting to procure Goodman's consent to the Zayre assignment. Goodman's moves to dismiss that claim because the alleged principal, Belscot, has released all claims against Goodman's.[12] May's retorts its agency is coupled with an interest and was thus not revocable by Belscot's settlement of its own claims.[13]

■ Although the Complaint does not allege specific facts in support of its theory, it does allege May's was an agent. Under Rule 12(b)(6) standards, May's is entitled to a chance to prove any set of facts that would uphold the agency-coupled-with-an-

**10.** This Court has negotiated countless major commercial leases (certainly many hundreds, and perhaps reaching into what the bankers call a low-four-figure balance) for both lessors and lessees. Invariably the informed lessee in a long-term lease wants to avoid the possibility that at some undefined future date, when the lessee may want or need to divest itself of the primary lease responsibility to an assignee (or perhaps alternatively to get a sublessee's commitment to pay rent), the lessor will take advantage of the situation by exacting a substantial ransom ("Necessitous men are not free men"). Thus the lessee always asks for an unconditional right of assignment or subletting. Just as invariably the informed lessor rejects such a blank check. Indeed such rejection typically occurs even where the assignor-lessee would remain liable under the lease after assignment, in which event an assignment would *add* a party to the financial assurances available to the lessor (for example, a shopping center lessor may legitimately be concerned about the nature of the lessee's identity or its business, as well as the mere payment of rent, because of the effect of these factors on other tenants' business; or the lease may have a percentage rent provision, raising like concerns). Sometimes the parties may come to an intermediate ground of permitting unfettered assignment to an assignee that meets certain financial standards (compare the second sentence of Section 6.01). But most frequently they end up with the "not unreasonably with-

hold consent" compromise. And never once in this Court's experience has that particular bargaining process carried a separate price tag, or has it even been a trading pawn for another provision that carried its own price tag.

**11.** See also 5 Corbin § 1008, at 75:

> If reason to foresee at the time of making the contract were not required, it might be reasonable to make a distinction between wilful breaches and nonwilful ones, in the former being satisfied with reason to foresee at the time the defendant chose to commit the breach. Apparently, no such distinction has been made, the courts being content with stating the requirement of foreseeability when the contract was made. In most cases the question is not a live issue, the existence of reason to foresee being determined by both court and jury without making fine distinctions as to time.

**12.** Goodman's submitted Lawrence Goodman's affidavit in support of its position. That poses the familiar problems associated with converting a Rule 12(b)(6) motion into one for summary judgment where the movant has not furnished *all* its ammunition, prepared to stand or fall in ultimate terms on its current showing.

**13.** *See Farns Associates, Inc. v. South Side Bank*, 93 Ill.App.3d 766, 773, 49 Ill.Dec. 128, 133, 417 N.E.2d 818, 823 (1st Dist.1981).

interest relationship.[14] *Mathers Fund,* 564 F.2d at 783. Thus Counts III and IV also withstand Goodman's motion to dismiss based on the Belscot release.

### Complaint Counts V and VI: Tortious Interference

Initially Goodman's argued Counts V and VI of the original complaint failed to state a claim for tortious interference with contractual relationships. May's has now shifted (by its Complaint amendment) to allegations of tortious interference with its business relationship with Zayre. This opinion of course deals with the revised claims.

■ May's has pleaded facts providing the elements of such a cause of action:

1. May's reasonable expectancy of entering into a business relationship with Zayre (Counts V and VI ¶¶ 4, 8);

2. Goodman's knowledge of that expectancy (Counts V and VI ¶¶ 5, 9);

3. Goodman's intentional interference that prevented the expectancy from ripening (Counts V and VI ¶ 9); and

4. May's damages as a result of Goodman's action (Counts V and VI ¶ 11).[15]

*See Woerner v. Brzeczek,* 519 F.Supp. 517, 523 (N.D.Ill.1981). Counts V and VI also survive attack at the pleading stage.

### Conclusion

As this opinion has made plain, it does not necessarily represent the final word on the subject in some respects. But at least for the present, Goodman's motion to dismiss is denied in its entirety. Goodman's is ordered to answer the Complaint on or before September 30, 1983.

---

14. For some reason unknown to this Court, the parties' discussion has always spoken in terms of *May's* as the proposed assignor. But the proposed assignment was of *Belscot's* lease, not the May's sublease. Hence the actual consent document, Ex. II to the Amendment to Complaint, properly spoke of Belscot's as well as May's desire to assign the Main Lease to Zayre.

---

15. May's has pleaded the necessary malice to uphold its claim for punitive damages, which are allowable under Illinois law. *See International Administrators, Inc. v. Life Insurance Co. of North America,* 541 F.Supp. 1080, 1084 (N.D. Ill.1982).